UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CARL BURGESS,

    Plaintiff,

v.

BASF CORP,

    Defendant.
                                       /

Case No. 05-72769

Honorable Nancy G. Edmunds

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [10]**

Defendant BASF Corporation brings this Motion for Summary Judgment of Plaintiff Carl Burgess's claims of (1) violation of the Family and Medical Leave Act and (2) violation of the Michigan Elliot-Larson Civil Rights Act. Although Plaintiff has abandoned his claim under the Michigan Elliot-Larson Civil Rights Act, a genuine issue of material fact remains as to whether Defendant violated the Family and Medical Leave Act. Thus, for the reasons discussed below, the Court GRANTS IN PART and DENIES IN PART Defendant's Motion.

**I.    Background**

Plaintiff began his career with Defendant in 1977. In 1999, he became a technical service representative, a position in which his responsibilities included developing polyurethane formulations and samples in the laboratory, preparing shipments and database entries, production management, and customer service. After 2001, Plaintiff reported to Steven Hicks and Michael Pcolinski, his immediate supervisor and unit manager, respectively. Plaintiff worked on six different accounts, but his primary account

was Worth Sports, Inc. ("Worth"), a manufacturer of softballs. Plaintiff claims that he did almost all of his work on the Worth account. (Doc. 13 at 3, 8.)[1]

As early as 1991 or 1992, Plaintiff experienced some performance problems related to his employment with Defendant. In 1992, for example, Plaintiff received an "Unsatisfactory" rating on his annual performance review. (Doc. 10 Ex. A.) Around the same time, Defendant placed Plaintiff on a performance improvement plan, a program designed by Defendant to help employees improve their job performance in areas of concern. In May of 1998, Plaintiff's supervisor warned that his "unsatisfactory performance and failure to follow corporate and department policies are unacceptable," and that Plaintiff's record demonstrated "a repetition of a prior performance problem . . . ." (Doc. 10 Ex. B.) In 2001, Plaintiff received a "Doesn't Meet" rating on his annual performance review (*Id.* at Ex. A), meaning, in Defendant's words, that Plaintiff's "job performance did not meet the company's minimum expectations." (*Id.* at 2.) Plaintiff's performance reviews were not all so negative, however; Plaintiff also received ratings of "Meets Requirements," "Good," and "Partially." (*Id.* at Ex. A.)

At least one of Plaintiff's performance problems involved his account with Worth, his foremost customer. This issue stemmed from a change in softball manufacturing specifications, as Plaintiff describes as follows:

> Prior to November of 2002 Worth . . . requested that I supply them with samples that would create[] a softball with a coefficient of restitution ("COR")

---

[1]Twice in his Response Brief, Plaintiff claims that 95% of his work was on the Worth account. Plaintiff cites four different pages in his own deposition, none of which directly support the 95% figure. (*See* Burgess Dep. at 13, 15, 23, 24.) Mr. Hicks states "at certain points it could have been as high as 90 percent," but for the overall year, "absolutely not, it could not have been 90 percent." (Hicks Dep. at 59.)

>of .444 after the American Softball Association (ASA) had set the specification at .440.
>
>Pursuant to my instruction from Worth I supplied it with samples for testing which had a COR value of .444.
>
>The COR sample with a value of .444 was put into production in September of 2002, and 48,000 softballs were produced in a 53 day period.
>
>On November 6, 2002 Mr. York, a Vice President of Worth, called me and told me he just found out that the COR value had to be lowered to .440. This meant that Worth had produced 48,000 balls that did not meet the specifications of the ASA. In response to his request I supplied him a .440 COR value sample three or four days later for a 12 inch softball, and before the end of December had sent him samples to produce an 11 inch softball.

(Doc. 13 Ex. 18.)

In a January 2003 performance evaluation, Mr. Hicks commended Plaintiff for his work on the Worth account: "Carl adapts well to changing priorities. . . . [T]he [ASA] changed their COR specifications late in the year. He very quickly made changes to already approved systems at Worth . . . ." (*Id.* at Ex. 3.)

Apparently, Worth did not share Hicks's satisfaction with Plaintiff's handling of the situation. In late 2002 or early 2003, Mr. York expressed to Mr. Pcolinski his "dissatisfaction about the level of service provided to Worth by [Plaintiff]. This dissatisfaction related to problems in addressing Worth's needs in a timely and effective manner." Mr. Pcolinski gives a similar account of this conversation: "As I recall, . . . the expectation was that BASF was given sufficient time to produce product that would manufacture balls to those specifications, and that we failed to deliver product solutions in a timely fashion . . . ." (Pcolinski Dep. at 28.) Later, Mr. York requested that Mr. Pcolinski and Mr. Hicks replace Plaintiff as Defendant's technical service representative for Worth. (*Id.* at Ex. C.)

3

On April 21, 2003, Plaintiff went to the hospital emergency room with chest pains and shortness of breath. He had suffered a heart attack and was diagnosed with a coronary artery disease. Plaintiff states that on the next day, when he was still in the hospital, he spoke with Mr. Hicks and specifically requested leave under the Family and Medical Leave Act. (Burgess Dep. at 41.)  Plaintiff did not make this request in writing, however.

Prior to his heart attack, Plaintiff had made business-related charges on his corporate American Express credit card, which became due while he was away from work. On July 1, 2003, Mr. Hicks sent Plaintiff a letter notifying him that his account was sixty days past due, and that the "situation needs to be resolved as quickly as possible." (Doc. 13 Ex. 7.) Mr. Hicks asked Plaintiff to return the necessary expense reports and receipts so that Defendant could reimburse him for expenses, allowing him to pay his credit card bill more easily.  Plaintiff failed to take any action:

> I was unable to pay the bill because the receipts necessary to do my expense report were at work. Given my physical condition and all I had been through I did not have the presence of mind to request that someone take care of my reports for me, and in any event was unsure where at work the information necessary to do the expense report had been left.

(*Id.* at Ex. 18.)  By the time Plaintiff returned to work in July, his account was ninety days overdue and was cancelled for nonpayment. This was not the first time that Plaintiff failed to pay his American Express account; it had also gone more than sixty days delinquent in December of 2002.

On October 10, 2003, Mr. Hicks wrote a memorandum to Plaintiff to place him on a performance improvement plan.  The memorandum addresses ten areas of concern, including punctuality, leaving work without authorization, advance notice of the use of vacation time, use of the American Express account, safety and quality violations,

4

knowledge of chemistry, computer skills, and reporting of progress. (Doc. 13 Ex. 17.) For reasons that are unclear, this memorandum was never delivered to Plaintiff. (Doc. 13 at 19.)

On November 11, 2003, Plaintiff placed a telephone call to Defendant's "Alertline" hotline, in which he complained of treatment he was receiving at work, including the reassignment of his accounts to other associates. Of particular concern was the reassignment of the Worth account (at Worth's request), which had been Plaintiff's primary responsibility. Plaintiff noted that Mr. Hicks and Mr. Pcolinski[2] had informed him of Worth's concerns, as well as their own concerns about his performance and his future opportunities with Defendant. Plaintiff "stated he[] believes he[] is being 'forced out' of the department, and that Mr. Hicks and Mr. [Pcolinski] are attempting to terminate him[]." (Doc. 13 Ex. 9.)[3]

On November 20, 2003, Plaintiff was placed on a performance improvement plan for the second time, described as "a final attempt for you to attain an acceptable level of performance." Mr. Hicks's memorandum admonished Plaintiff for "unacceptable" handling of the administrative aspects of his job, including his handling of his American Express account, and required detailed reporting of administrative matters. The memorandum further required Plaintiff to rectify his "careless and unprofessional" written communications

---

[2]It appears that Mr. Pcolinski is misidentified in the call report as "Mr. Shazinski."

[3]Although Plaintiff asked that his hotline telephone call remain anonymous, he was told that his identity might be revealed during the course of investigation. (Doc. 13 Ex. 9.) After a report was faxed to him on November 19 or 20, Defendant's human resources specialist Kyrus McNeil determined that "[i]nformation from the call and the investigation indicates that the caller is Carl Burgess . . . ." (*Id.* at Ex. 13.) It is not entirely clear when Mr. McNeil made this discovery, but he first documented it in a December 9, 2003 memorandum.

5

to customers. Moreover, because much of Plaintiff's work was untimely and of poor quality, Mr. Hicks required him to submit, biweekly, both a schedule of ongoing work projects and a report on the status of those projects. Plaintiff was required to submit a separate biweekly report regarding these areas of concern. Mr. Hicks cautioned that Plaintiff's failure to improve his work quality could result in termination. (Doc. 10 Ex. J.)   At the end of his ninety-day performance improvement plan, Plaintiff was terminated. In a February 16, 2004 memorandum recommending termination, Mr. Hicks wrote,

> The performance of Carl M. Burgess . . . is unacceptable. Since he was placed on a ninety . . . day performance improvement plan . . . : he continued to ignore or only partially fulfill the administrative aspects of his position; there was not significant improvement in his written communications; he continued to work on projects that he was told would not provide enough benefit to BASF and he did not make significant progress on two of the three development projects he was assigned. . . .  He failed to attend the mandatory safety meeting for January 2004, even though two e-mails were sent notifying him of the date and time, and an announcement was made over the intercom just prior to the meeting.

(Doc. 13 Ex. 14.)

**II.    Standard of Review**

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In evaluating a motion for summary judgment, the Court must "construe the evidence and draw all reasonable inferences in favor of the nonmoving party." *Id.* The non-moving party may not rest upon its mere allegations, however, but rather "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

## III. Discussion

Plaintiff's complaint alleges that after his return from medical leave, he "was not returned to his position but placed in a newly created job, stripped of his accounts, . . . given insignificant assignments on an ad hoc basis, and his performance was unfairly criticized." (Doc. 1 at 3.) This treatment, Plaintiff argues, violated the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*[4]

The FMLA allows employees up to twelve weeks of medical leave per year if they suffer "a serious health condition that makes the employee unable to perform the functions of [his or her] position." 29 U.S.C. § 2612(a)(1)(D). It is "unlawful for any employer to

---

[4]Plaintiff further alleges that Defendant "retaliated against [him] for exercising his rights under the FMLA and complaining that his rights had been violated as prohibited by the [FMLA]." (Doc. 1 at 3.) In his Brief, however, Plaintiff has not argued that retaliation for making a complaint, as opposed to exercising an FMLA right, is unlawful.

interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the FMLA. 29 U.S.C. § 2615(a)(1).

To gain the protection of the FMLA an employee owes a duty to his or her employer to provide notice of the need for FMLA leave. *See* 29 U.S.C. § 2612(e)(2)(B). "[T]he critical test for substantively-sufficient notice is whether the information that the employee conveyed to the employer was reasonably adequate to apprise the employer of the employee's request to take leave for a serious health condition that rendered him unable to perform his job." *Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 421 (6th Cir. 2004).

A prima facie case of retaliatory discharge requires a showing that (1) Plaintiff availed himself of a protected right under the FMLA by notifying Defendant of his intent to take leave, (2) Plaintiff suffered an adverse employment action, and (3) there is a causal connection between Plaintiff's exercise of an FMLA right and the adverse employment action. *See Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 314 (6th Cir. 2001). *But see Stubl v. T.A. Systems, Inc.*, 984 F. Supp. 1075, 1090 (E.D. Mich. 1997) ("a prima facie case . . . requires proof that Plaintiff: (1) engaged in an activity protected by [the FMLA]; (2) that this exercise of his [or her] protected . . . rights was known to defendant; (3) that defendant thereafter took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action"). "A plaintiff's burden in establishing a prima facie case is not intended to be an onerous one." *Skrjanc*, 272 F.3d at 315 (citing *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 870 (6th Cir. 2001)).

Defendant's primary argument as to Plaintiff's FMLA claim is that Plaintiff "cannot maintain any FMLA claim because he never took FMLA leave or even requested it." (Doc. 10 at 9.) Defendant relies on a number of cases holding that an employee must request FMLA leave before he is entitled to the protection of the FMLA. *See Speziale v. Bethlehem Area Sch. Dist.*, 266 F. Supp. 2d 366, 376 (E.D. Pa. 2003); *Jarjoura v. Ericsson, Inc.*, 266 F. Supp. 519, 529 (N.D. Tex. 2003); *Woodard v. Union Pacific R.R. Co.*, 186 F. Supp. 2d 703 (S.D. Tex. 2002).

While Defendant makes a persuasive legal argument, the facts do not support its position. Plaintiff was asked during his deposition, "Did you request leave under the Family and Medical Leave Act?" Plaintiff responded, "Yes. . . . To basically Mr. Hicks." Plaintiff states that he made his oral request on or around April 22, 2003, when he was in the hospital. (Burgess Dep. at 41.)

Defendant relies on a different portion of Plaintiff's deposition, in which Plaintiff states that he had not done anything specific to be placed on FMLA leave. Defendant takes this statement out of context, however. The full transcript reveals that Plaintiff was referring only to a written request for FMLA leave:

> Q: Sir, I'm going to hand you . . . a letter addressed to you dated April 24th, 2003 from BASF. . . . Can you tell me approximately when you saw it?
>
> A. Probably like May sometime, the following month. . . .
>
> Q. Now, this letter in the fourth paragraph says that your absence may also qualify as unpaid leave under the Family and Medical Leave Act. Did you do anything specific that you recall to ask to be put on FMLA leave?
>
> A. No.

(*Id.* at 43.)

Taken together, Plaintiff's testimony is that he asked for FMLA leave on or around April 22nd, when he spoke with Mr. Hicks, but that he did nothing further to request FMLA leave specifically. "Once an employer is given notice that an employee is requesting leave for a FMLA-qualifying reason, the employer bears the obligation to collect any additional information necessary to make the leave comply with the requirements of the FMLA." *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 450 (6th Cir. 1999). Thus, assuming Plaintiff's testimony to be true, he has presented sufficient evidence to put Defendant on notice of his intent to take FMLA leave.[5]

Having presented evidence that he communicated his wish to be placed on FMLA leave, Plaintiff has cleared the first hurdle in establishing a prima facie case of retaliation. Moreover, there is no dispute that Plaintiff suffered an adverse employment action. The final issue, therefore, is whether there was a causal connection between Plaintiff's expressed desire to be placed on FMLA leave and the adverse employment action.

"[W]hen an employee raises the issue of whether the employer discriminated against an employee by taking adverse action against the employee for having exercised an FMLA right, the question of intent is relevant. The issue becomes whether the employer's actions were motivated by an impermissible retaliatory or discriminatory animus." *King v. Preferred Tech. Group*, 166 F.3d 887, 891 (7th Cir. 1999). As both Plaintiff and Defendant acknowledge, "the ultimate inquiry is Mr. Hick's [sic] intent." (Doc. 13 at 16; Doc. 14 at 4.)

---

[5]Defendant also argues that Plaintiff's decision to take short term disability leave is inconsistent with FMLA leave. (Doc. 14 at 1-2.) Defendant provides no reason, however, why an employee designated under short term disability automatically loses the protection of the FMLA.

Defendant's sole argument as to intent is that it had no knowledge of Plaintiff's desire to take FMLA leave, and therefore could not have intended to retaliate for exercising an FMLA right: "Neither Pcolinski nor Hicks could have retaliated against [Plaintiff] for exercising rights under the FMLA because neither knew that he had exercised such rights." This argument is essentially the same as Defendant's argument regarding notice, and it fails for the same reason: Plaintiff testifies that he requested FMLA leave from Mr. Hicks, thus putting Defendant on notice. In *Sahadi v. Per-Se Tech., Inc.*, 280 F. Supp. 2d 689 (E.D. Mich. 2003), the Court rejected the same argument that Defendant now makes:

> Per-Se . . . argues that there is no causal connection between the exercise of Sahadi's FMLA rights and the decision to terminate her because Kotwica, who Per-Se says alone had the authority to terminate Sahadi, did not know that Sahadi had exercised her FMLA rights. This argument lacks merit. Sahadi testified that she spoke with Kotwica about needing time off to care for her husband. This creates a factual question not only as to whether Sahadi invoked her FMLA rights, but also whether Kotwica was aware that Sahadi was missing work to care for her husband. Thus, Sahadi has established this element sufficient to survive summary judgment.

*Id.* at 699-700.

Furthermore, Plaintiff contends that while his performance had been subject to very little criticism before his sick leave, he was "berated" and subject to unfair criticisms for his performance after he returned from his sick leave. (Doc. 13 at 16.) Plaintiff argues that the proximity in time between his sick leave and his termination suggests that Defendant's motivation was impermissible. This circumstantial evidence suffices to establish a causal connection between the exercise of FMLA rights and the adverse employment action. *See Skrjanc*, 272 F.3d at 314 ("the proximity in time between Skrjanc's request for leave and his discharge constitutes indirect evidence of a causal connection between his exercise of

11

a right under the FMLA and the adverse employment decision"). Plaintiff has therefore established a prima facie case of retaliation.

In an FMLA case relying upon indirect evidence, the Court must next apply the three-step process articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Skrjanc*, 272 F.3d at 315 (citing *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 161 (1st Cir. 1998)). Under *McDonnell Douglas*, because Plaintiff has established a prima facie case of discrimination, the burden shifts to Defendant to articulate a legitimate, nondiscriminatory reason for Plaintiff's discharge. 411 U.S. at 802-04. If Defendant can articulate a nondiscriminatory reason, the burden returns to Plaintiff to show that Defendant's articulated reason is a mere pretext to mask discrimination. *Id.* at 804-06.

Defendant does not argue that its decision to terminate Plaintiff was nondiscriminatory, instead resting on its arguments as to Plaintiff's prima facie case which, as discussed above, lack merit. Presumably, however, Defendant would argue that its justifications for terminating Plaintiff are noted in the February 16, 2004 memorandum in which Mr. Hicks stated that Plaintiff failed to fulfill administrative responsibilities, improve written communications, work on the correct projects, and attend a safety meeting. In addition, Defendant might have found that Plaintiff's termination was justified by his shortcomings on the Worth account, the problems with his American Express account, poor punctuality, or insufficient knowledge of chemistry, among other things.

While these appear to be valid justifications, Plaintiff makes a strong argument that they are simply pretextual. For example, Plaintiff's allegedly poor written communications presented no problem for Mr. McNeil, who stated that he did not have "[a]ny problem . . . in terms of grammar, syntax, spelling, anything." (McNeil Dep. at 56.) If Plaintiff's

knowledge of chemistry was unsatisfactory, it is difficult to understand how he completed so many years of service for Defendant. Plaintiff's work on unimportant accounts is understandable, since the Worth account had nearly accounted for his entire workload. On a related note, while Defendant makes much of Worth's request that Plaintiff be replaced, Plaintiff points out that Mr. Hicks had previously commended his work on the Worth account. Finally, Plaintiff had what many would consider a valid excuse for his overdue American Express account: he had suffered a heart attack, was home sick, and had no access to the receipts needed to recover his expenses.

Admittedly, this is a close question, and the evidence seems to weigh in Defendant's favor. Nevertheless, a reasonable jury could reject Defendant's purported justifications for terminating Plaintiff as purely pretextual. Plaintiff's explanations and arguments raise serious questions, especially because Defendant had few problems with Plaintiff's performance before he took medical leave, but had many questionable complaints after he returned to work. Indeed, Defendant justified its termination in part based on behavior that it had previously commended. This is too close a factual question to decide on summary judgment.

### IV.  Conclusion

Being fully advised in the premises, having read the pleadings, and for the reasons set forth above, the Court hereby GRANTS IN PART and DENIES IN PART Defendant's Motion for Summary Judgment. Pursuant to Defendant's argument and Plaintiff's voluntary abandonment of the issue, Plaintiff's age discrimination claim is DISMISSED. A genuine issue of material fact remains, however, as to Plaintiff's claim under the Family and Medical Leave Act.

>
> s/Nancy G. Edmunds
> Nancy G. Edmunds
> United States District Judge

Dated:  June 20, 2006

I hereby certify that a copy of the foregoing document was served upon counsel of record on June 20, 2006, by electronic and/or ordinary mail.

> s/Carol A. Hemeyer
> Case Manager